**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**PHOENIX HELIPARTS, INC AND PHOENIX HELI-SUPPORT, L.L.C.**

**AS SELLER**

**AND**

**TKC AEROSPACE, INC. OR ASSIGNEE**

**AS BUYER**

**Dated as of April 5, 2016**

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") dated as of April 5, 2016 is made and entered into by and among Phoenix Heliparts, Inc., an Arizona corporation ("PHP"), debtor in the Bankruptcy Case (defined below), dealing with its own property and the property of Phoenix Heli-Support, L.L.C., an Arizona limited liability company ("PHS") which has been substantively consolidated with PHP by order of the Bankruptcy Court (hereinafter collectively "Seller"), and TKC Aerospace, Inc., an Alaskan Native Company, or its assignee ("Buyer"). Seller and Buyer shall sometimes individually be referred as a "Party" and collectively be referred to as the "Parties".

## W I T N E S S E T H:

WHEREAS, Seller is currently engaged in the business of maintaining, retrofitting selling and distributing rotary aircraft and related materials and supplies through PHP and PHS (the "Business");

WHEREAS, Seller uses certain assets in the operation of its Business at its Mesa, Scottsdale and Honolulu locations (the "Premises");

WHEREAS, PHP has filed a voluntary petition (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") (the date of such filing, the "Petition Date");

WHEREAS, on October 19, 2015, the Bankruptcy Court held that the appointment of a Chapter 11 trustee was warranted under 11 U.S.C. §1104. (Dkt. 97);

WHEREAS, on October 22, 2015, the Bankruptcy Court appointed Louis A. Mukai as Chapter 11 trustee ("Trustee") [Dkt. 104]. To date, the Trustee continues as the duly appointed and acting Chapter 11 trustee in the Bankruptcy Case;

WHEREAS, on March 11, 2016, following a three day evidentiary hearing, Chief Judge Daniel P. Collins entered the "Order Granting Substantive Consolidation" (the "SubCon Order") whereby, among other things, (i) the bankruptcy estate of PHP was, effective immediately, consolidated with PHS, and all assets and liabilities of PHS were now contained within the Chapter 11 bankruptcy estate of PHP; (ii) PHS, as a corporate entity, was merged into the corporate entity of PHP, and the Trustee was given the full power and authority to effectuate this merger; and (iii) the Trustee was awarded the full power and authority to perform all duties necessary to effectuate and carry out the terms of the SubCon Order. (Dkt. 49 in Adv.Pro. 2:16-ap-00013-DPC);

WHEREAS, Buyer desires to purchase and acquire from Seller, and Seller desires to sell and transfer to Buyer, the Purchased Assets (as defined below) in a transaction pursuant to sections 105, 363 and 365 of the Bankruptcy Code, as well as under Arizona state law;

WHEREAS, TKCA is an arms-length, good faith purchaser under Bankruptcy Code Section 363(m);

WHEREAS, the Parties seek the waiver of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure. Accordingly, the Order entered approving this Agreement shall be effective immediately, without any stays or delays; and

1.

WHEREAS, the Trustee of PHP and PHS, pursuant to the SubCon Order, has determined that it is advisable and in the best interests of the Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, and has approved the same.

NOW, THEREFORE, in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## PURCHASE AND SALE

1.1     Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all of Seller's right, title and interest in, to and under the Purchased Assets free and clear of all mortgages, liens (including judicial and statutory liens), security interests, encumbrances, claims (including options and rights of first refusal), charges, pledges, hypothecations, covenants, interests and restrictions of any kind or character (collectively, "Encumbrances") pursuant to Sections 363(b) and (f) of the Bankruptcy Code. "Purchased Assets" shall mean the following assets of Seller:

(a)     Inventory. All Inventory which shall consist of all inventory of Seller's Business wherever located  (the "Inventory");

(b)     Equipment. All equipment of Seller's Business wherever located, (the Equipment");

(c)     Unfilled Trade Purchase Orders and Open Supply and Sales Contracts. Buyer is acquiring and assuming selected unfilled trade purchase orders with Seller's vendors. Buyer is acquiring and assuming selected unfilled open supply and sales contracts with Seller's customers (the "Supply Contracts") entered into by Seller prior to the Closing to the extent that such contracts are open, unfilled in whole or in part on the Closing Date and were made in the ordinary course of the Business, all of which are listed in Schedule 1.1(c). Seller shall deliver an updated Schedule 1.1(c) as of the Closing Date to Buyer;

(d)     Business Contracts. The contracts identified in Schedule 1.1(d) (the "Business Contracts") shall be assumed by and assigned to the Purchaser. Any and all Business Contracts not assumed and assigned pursuant to the order approving the sale or [any prior or subsequent orders] shall be subject to rejection by the Trustee. TKCA shall designate those contracts that it intends to assume as soon as possible but no later than ten calendar days after entry of an Order approving the Sale, provided that such list is subject to change prior to Closing and based on discussions between TKCA and contracting parties;

(e)     Customer Lists and Records.  Seller's lists of current customers of the Business, including mailing lists and advertised telephone numbers all of which are listed on Schedule 1.1(e) (collectively, the "Customer Lists"), and copies of Seller's files and records related to such customers. Seller shall deliver an updated Schedule 1.1(e) as of the Closing Date to Buyer at Closing;

(f)     Tooling, Dies, Plates and Artwork. All tooling, tools, dies, plates artwork, advertising artwork, and related items located at the Seller's Premises or at the facilities of third party manufacturers and owned by: (a) customers of the Business and in Seller's possession;

2.

and/or, (b) Seller on behalf of customers of the Business.

(g) *Domain Names*. All of the domain names set forth on <u>Schedule 1.1(g)</u> relating to the Business conducted by the Seller through such websites;

(h) *Intellectual Property*. All intellectual property used in connection with or otherwise related to the Domain Names, including, but not limited to, the Trademarks, Tradenames, patents, computer software (subject to licensing agreements in place), plans, manuals, and trade secrets, including but not limited to those items identified on <u>Schedule 1.1(h)</u>, and all Documents that are used in, held for use in or intended to be used in, or that arise out of, such Intellectual Property;

(i) *Employee Records*. Copies of all employee files and personnel records of any of Seller's current employees that become employees of Buyer after the purchase (to the extent that copies of such files can be provided to Buyer under applicable law) and employment contracts for all current or prior employees;

(j) Accounts Receivable and Work in Process.  Open accounts receivable and goods or services that have not yet been completed for any contract or agreement for which Buyer assumes the contract or agreement as set forth in Schedule 1.1(c). Any contractual rights for any executory contract that is expressly assumed;

(k) <u>FF&E & Misc. Tangible Assets</u>. Any goods, furniture, fixtures computers, servers, phone systems, security systems, vehicles, aircraft, and/or equipment;

(l) <u>STCs</u>. Supplemental type certificate is a type certificate (TC) issued when an applicant has received FAA approval to modify an aeronautical product from its original design. The STC, which incorporates by reference the related TC, approves not only the modification but also how that modification affects the original design;

(m) <u>FAA 145 Certifications</u>. Seller's cooperation in transfer of the FAA 145 Certifications held by PHP and PHS;

(n) <u>Misc. Property</u>. All property related to any of the foregoing, including, but not limited to, all warranties, owner's manuals, site plans, technical drawings, engineering documents, certificates of designations, FAA certifications, approvals, and correspondence; and

(o) *Goodwill*. All goodwill and other intangible assets of the Seller associated with the Business as a going concern.

1.2     <u>Claims Pertaining to Purchased Assets</u> All post-petition causes of action held by Buyer for post-petition dissipation of estate assets that accrued or arose on or after January 1, 2016, interference with implementation of the sale and sale process and/or provisions of the Asset Purchase Agreement ("APA"), the enforcement of the sale order and/or APA against third parties, and/or breaches of any and all PHP or PHS employment agreement's / covenants not to compete, including any actions for turnover of assets and injunctive relief necessary to enforce transferred rights.  Notwithstanding the foregoing, Seller/Trustee is not selling and shall retain all actions based on pre-petition acts, all actions under Sections 544 et. Seq., and all other estate causes of action including any and all causes of action through and from the Petition Date through December 31, 2015.  For example, an action to recover inventory stolen post-petition after December 31, 2015 that would have been part of this APA would be actionable by Buyer.  Actions for pre-petition preferences, fraudulent transfers, avoidance of liens pursuant to "strong-arm" powers, pre-petition breach of fiduciary duties, would all remain in the estate as actions not sold to Buyer.  If any disputes arise over the ownership of a cause of action, such

3.

dispute shall be submitted to the Bankruptcy Court for final resolution, consent to which is hereby provided by Buyer and Seller.

1.3    No Assumption of Liabilities by Buyer.  Except for its obligations expressly undertaken under the terms of contracts assumed by the Buyer, Buyer does not otherwise assume and shall not assume any debt, obligation, unrefunded or owing customer deposits, claim, recoupment, counterclaim, setoff, taxing obligation, lease or any other liability or obligation of Seller, or its subsidiaries, affiliates or owners, of any kind or nature whatsoever, absolute or contingent, known or unknown, whether such liability or obligation arose prior to, on or after the Closing (collectively, the "Excluded Liabilities").

1.4    Excluded Assets. Without limitation, except for the Assets described in Section 1.1, and the attached Schedules referenced in Section 1.1, Buyer will not acquire, in connection with the transactions contemplated by this Agreement, any assets or properties of Seller whatsoever, whether real or personal, tangible or intangible, including but not limited to the following property:

a.    No Conveyance of UnOwned Property.  Buyer understands and acknowledges that certain customer or employee owned property may be located in the business premises.  None of this property is being conveyed herein, and includes the specifically identified property listed in Schedule 1.5.

b.    Accounts Receivable ("AR").  All AR, except certain AR owed by parties to an executory contract located in Schedule 1.1(c)  that Buyer expressly agrees to assume as part of the sale and which assumption is approved;

c.    Causes of Action.   Subject to paragraph 1.2, Bankruptcy Code, federal law and state law causes of action under Section 544, et. seq. of the Bankruptcy Code, fraudulent transfer laws, and any putative action against Dickstein Shapiro; its successors or assigns.

d.    ROK Bond. Any and all rights to the refund, if any, of all or part of the Bond held by the Republic of Korea;

e.    Cash/ cash deposits.  Cash on hand and cash deposits of PHP and PHS on the Closing Date, unless the deposit relates to an executory contract that the Buyer is expressly assuming and the Court approves such assumption.

## ARTICLE II

## PURCHASE PRICE

2.1    Purchase Price for Purchased Assets. The purchase price for the Purchased Assets shall be One Million Six Hundred Thousand Dollars (the "Purchase Price") in cash, payable as follows:

One Million Six Hundred Thousand Dollars, payable $250,000.00 by application of the bidding deposit already paid to Seller as a good faith deposit (the "Deposit"). Subject to the terms and conditions of this Agreement, as full consideration for the Purchased Assets, at the Closing, Buyer shall pay to Seller the balance of the cash due hereunder, being One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00).

4.

2.2     Reserved.

2.3     Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets in accordance with Schedule 2.3 as prepared by Buyer in its sole discretion. The parties shall file all tax returns (including amended returns and claims for refund) in a manner consistent with such allocation and shall use their reasonable best efforts to sustain such allocation in any subsequent tax audit or tax dispute.

2.4     Waiver of Participation in Proceeds: $1,400,000. TKCA will waive distributions/dividends due to TKCA from the estate for its pro-rata share of estate assets on account of TKCA's general unsecured claim (per the claim stipulation filed and pending approval) until such distributions to TKCA would equal $1,400,000.   Until such time as this threshold would be met, TKCA takes no distributions on account of its general unsecured claim. After the threshold is met, TKCA shall be entitled to participate pro-rata in all further distributions on account of its allowed general unsecured claim. ***This waiver applies only to a sale under which TKCA is the winning bidder and the Bankruptcy Court approves TKCA's winning bid, and such Sale is closed under the terms hereunder.***

# ARTICLE III

## THE CLOSING

3.1     Closing Date. Unless terminated pursuant to Article XI, subject to the satisfaction of the conditions set forth in Article X hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets (the "Closing") shall take place at the offices of The Cross Law Firm, P.L.C., 1850 N. Central Avenue, Suite 1150, Phoenix, AZ  85004 (or at such other place as the Parties may designate in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article XI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and no later than April 4, 2016, unless another time or date, or both, are agreed to in writing by the Parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date," and the Closing shall be deemed effective at the close of business on the Closing Date.

3.2     Deliveries by Seller. At the Closing, Seller shall deliver, or cause to be delivered,if not delivered previously, the following to Buyer:

(a)     a counterpart of the Bill of Sale and Assignment Agreement substantially in the form attached hereto as Exhibit "A" (the "Bill of Sale"), and such other instruments of conveyance reasonably necessary for the transfer of the Purchased Assets duly executed by Seller;

(b)     all Documents of Title (as defined in the Uniform Commercial Code) issued to Seller with regard to the Purchased Assets, or a letter agreement from Seller to Buyer to exercise commercially reasonable efforts to deliver such Documents of Title to all such Purchased Assets within twenty (20) days after Closing;

(c)     Passkeys, codes and other items necessary to give Buyer access to the Premises; and

(d)     all such other agreements, documents and instruments as may be reasonably required by Buyer to complete the transactions provided for in this Agreement.

3.3     Deliveries by Buyer. At the Closing, Buyer shall deliver, or cause to be delivered,

5.

the following to Seller:

(a)     the Purchase Price, less the Deposit, by wire transfer of immediately available funds to Trustee's account for both the combined sale price of PHS and PHP;

(b)     a counterpart of the Bill of Sale, duly executed by Buyer; and

(c)     all such other agreements, documents and instruments as may be reasonably required by Seller to complete the transactions provided for in this Agreement.

3.4.     <u>Assumption or Rejection of Executory Contracts by Buyer</u>. Buyer shall designate its preferences regarding assumption and rejection of executory contracts and Buyer and Seller shall cooperate regarding any proceedings to gain approval of any contested assumption thereof.

**ARTICLE IV**

**<u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>**

The Seller represents and warrants to Buyer as follows:

4.1     <u>Organization Standing and Authority of the Seller</u>. As to PHP, the Seller is an Arizona corporation, validly existing in good standing under the laws of the State of Arizona and Trustee has full power and authority under the Bankruptcy Code to own, lease and operate its property and assets.  As to PHS, the Seller  is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Arizona and the Trustee has full power to own, lease and operate its properties and assets it now owns or leases and operates and to carry on its Business as now being conducted pursuant to the SubCon Order. The Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction in which its failure to qualify would have a material adverse effect on its financial condition, assets, properties, business or prospects.

4.2     <u>Authorization of Agreement</u>. Subject to the entry of the Sale Order:

(a) Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Seller's Documents</u>"), to perform its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (b) this Agreement has been, and each of the Seller's Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller's Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

4.3     <u>No Violation; Consents</u>. Upon or after the entry of the Sale Order, the execution and delivery of this Agreement and the Seller's Documents and the  performance of Seller's obligations herein or therein will not (i) conflict with or result in any breach of any provision of the organizational documents of Seller, (ii) violate any applicable foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a governmental authority (collectively, "<u>Law</u>"), (iii) require any consent, approval, authorization or permit of, or filing with or notification to,  any governmental authority or other Person which has not otherwise been

6.

obtained or made, or (iv) result in the imposition of any Encumbrances upon the Assets, except as are excused by or unenforceable as a result of the filing of the Bankruptcy Case or the applicability of any provision of, or any Law under, the Bankruptcy Code.

4.4    Title to Purchased Assets. PHP owns each of the PHP Purchased Assets, and Buyer will be vested with good title to such PHP Purchased Assets, free and clear of all Liens and Encumbrances to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

4.5    Permits. Schedule 4.5 sets forth all Permits used by Sellers in the Business. Sellers are in compliance with the material terms of all such Permits, and all such Permits are valid and in full force and effect, and no proceeding is pending or, to the Seller's Knowledge, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

4.6    Title    Title is being conveyed from Buyer to the Seller as is, where is with no warranties or representations of any kind of guaranties.

4.7    Intentionally deleted.

4.8    Litigation. Except for the Bankruptcy Case and as otherwise disclosed herein, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of PHP's Knowledge, threatened against or relating to Seller or any of the Purchased Assets, or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Seller is not aware of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

4.9    Compliance with Laws. Except as set forth on Schedule 4.9, and to Seller's Knowledge, the Seller and the Business, the Purchased Assets, and Business practices have substantially complied in all material respects with all applicable laws, rules, regulations, orders and other requirements of governmental authorities.

4.10.    Tax Matters. Except as set forth in Schedule 4.10:

(a)    Seller has or will have (i) timely filed with the appropriate taxing authority (taking into account all available extensions) all tax returns concerning material taxes applicable to the Purchased Assets or the Business that are required to be filed by applicable law in all jurisdictions in which such tax returns are required to be filed prior to the date hereof or the Closing Date, as the case may be, and all such tax returns were true, accurate and complete in all material respects, and (ii) timely paid in full all taxes shown as due on such tax returns;

(b)    there are no material liens with respect to any taxes upon any of the Purchased Assets, other than (i) taxes, the payment of which is not yet due, or (ii) taxes or charges being contested in good faith by appropriate proceedings; and

(c)    Seller is current with respect to all payroll and sales taxes.

4.11    No Brokers. Seller has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finder's fees in connection with the transactions contemplated herein.

4.13    Disclosure. No representation or warranty by Seller contained in this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a

7.

material fact which is necessary in order to make the statements contained herein or therein not false or misleading. All documents delivered or to be delivered by Seller to Buyer pursuant to this Agreement are or will be true and complete copies of such documents in Seller's possession.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller as follows:

5.1     <u>Organization, Good Standing and Authority of the Buyer</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Alaska and has full corporate power to own, lease and operate its properties and assets it now owns or leases and operates and to carry on its business as now being conducted. The Buyer is duly qualified or licensed to do business and is in good standing in each jurisdiction in which its failure to qualify would have a material adverse effect on its financial condition, assets, properties, business or prospects.

5.2     <u>Authorization of Agreement; Binding Obligation</u>. Buyer has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Buyer Documents</u>"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer. This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     <u>No Violation</u>. This Agreement and the execution and delivery of this Agreement by Buyer does not, and the consummation by Buyer of the transactions contemplated hereby will not, materially violate or result in a material breach of (i) any material agreement, instrument or obligation to which Buyer is a party, or by which Buyer may be bound, except for such defaults as to which requisite waivers or consents have been or will be obtained prior to Closing, or (ii) any order, judgment, decree or award of any court, governmental body or arbitrator applicable to Buyer.

5.4     <u>Financial Capability</u>. Buyer (i) has, as of the date hereof, and will have as of the Closing, sufficient funds available to pay the Purchase Price and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement; (ii) has, as of the date hereof, and will have at Closing, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (iii) has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or Liability of any kind which would impair or adversely affect such resources and capabilities.

5.5     <u>No Brokers</u>. Buyer has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finder's fees in connection with the transactions

8.

contemplated herein.

5.6 <u>Disclosure</u>. No representation or warranty by Buyer contained in this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact which is necessary in order to make the statements contained herein or therein not false or misleading. All documents delivered or to be delivered by Buyer to Seller pursuant to this Agreement are or will be true and complete copies of what they purport to be.

5.7 <u>Condition of the Assets</u>. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article IV</u> hereof (as modified by the Schedules hereto), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS."

## ARTICLE VI

## NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES

6.1 <u>No Survival of Representations and Warranties</u>. The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof. The Parties agree, however, that the foregoing limitations on the survival of the representations and warranties of the Parties shall not apply to a representation or warranty in the event that a Party has committed fraud or made an intentional misrepresentation with respect to such representation or warranty.

6.2 <u>Survival of Covenants</u>. The Parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

## ARTICLE VII

## COVENANTS OF THE PARTIES

7.1 <u>Expenses</u>. Except as otherwise specifically provided in this Agreement, Seller and Buyer shall bear their own respective fees, costs and expenses incurred in connection with this Agreement, including, but not limited to, their own legal and accounting fees, costs and expenses, and in connection with all obligations required to be performed by each of them under this Agreement and the transactions contemplated hereby.

7.2 <u>Buyer's Access to Information</u>. Prior to the Closing, Buyer may make such investigation (or from to time to time update previous investigations) and Seller shall give to Buyer and its counsel, accountants and other representatives reasonable access, during normal business hours and upon reasonable notice, throughout the period prior to the Closing, to the records, documents, facilities and personnel of Seller as Buyer may desire.

7.3 <u>Further Assurances</u>. Subject to the terms and conditions of this Agreement, each of the parties hereto will use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets pursuant to this Agreement. From time to time after the date hereof, without further consideration, Seller will, at Buyer's expense, execute and deliver such documents to Buyer as Buyer may reasonably request in order to vest in Buyer good title to the Purchased Assets.

7.4 <u>Sales and Transfer Taxes</u>. Seller shall pay all applicable sales and transfer taxes incurred in connection with the sale of the Purchased Assets.

7.5 <u>Notice of Certain Events</u>. On or prior to the Closing Date, Seller shall promptly notify Buyer in writing of (i) any occurrence, change or event which, if it occurred or existed on or prior to the date hereof, would have been required to have been disclosed on any of the Schedules to be delivered by the Seller to the Buyer pursuant to this Agreement.

7.6 <u>Operation of Business</u>. Until the Closing, Seller shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to operate the Business in the Ordinary Course of Business. Seller shall use commercially reasonable efforts to (A) preserve intact its respective business organization, (B) maintain the Business, (C) , (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Seller in connection with the operation of the Business and (E)

7.7 <u>Record Retention</u>. Each Party agrees that for a period of not less than one (1) year following the Closing Date, it shall not destroy or otherwise dispose of any of the books and records relating to the Purchased Assets in its possession with respect to periods prior to the Closing. Each party shall have the right to destroy all or part of such books and records after the third anniversary of the Closing Date or at an earlier time by giving each other party hereof twenty (20) Business Days' prior written notice of such intended disposition and by offering to deliver to the other party, at the other party's expense, custody of such books and records as such first party may intend to destroy.

7.8 <u>Further Information</u>. Following the Closing, each Party will afford to the other party, its counsel and its accountants, during normal business hours, reasonable access to the books and records relating to the Purchased Assets in its possession with respect to periods prior to the Closing and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting party (i) to facilitate the investigation, litigation and final disposition of any claims which may have been or may be made against any party or its affiliates, and (ii) for any other reasonable business purpose. Each party hereto and its agents shall keep confidential and not disclose any information learned as a result of any examination conducted pursuant to this <u>Section 7.8</u> to any other person without the prior consent of the other party unless (i) the disclosure is required by the Bankruptcy Court in connection with the Sale Motion; (ii) the disclosure is in response to legal order or subpoena; or, (iii) the terms are readily ascertainable from public or published information, or trade sources (without violation of the foregoing provisions of this sentence). Each party shall reimburse the other for reasonable out-of-pocket costs and expenses incurred in assisting the other pursuant to this Section 7.8.  Neither party shall be required by this <u>Section 7.8</u> to take any action that would unreasonably interfere with the conduct of its business or unreasonably disrupt its normal operations.

7.9 <u>Cooperation</u>.  Following the Closing Date, the parties agree to cooperate with each other in investigating, defending or prosecuting any claims by or against the other with respect to any third person or entity, not a party to this Agreement, with respect to the business operations, assets or liabilities of the parties with respect to the assets sold and purchased pursuant to this Agreement. Each party will reimburse the other for their reasonable and necessary expenses incurred in providing such cooperation. Such cooperation will be limited to that reasonably necessary for the defense or prosecution of the claim but will include cooperation in the furnishing of information, documents and records, testimony, and such other aid as either party may require under the circumstances. Without limiting the foregoing, TKCA

10.

will grant license to Trustee to access presale computer data to pursue avoidance actions and Accounts Receivable. TKCA and Seller may also contact TKCA personnel to assist the Trustee in final billings and storage of any customer equipment or parts not returned prior to closing.

7.10 <u>Bankruptcy Court Matters</u>. See <u>Article XI</u> for Seller's covenants re Bankruptcy Matters.

## ARTICLE VIII

## EMPLOYEES AND CONSULTANTS

8.1 <u>Employee Matters</u>.

(a) The employees of the Business are identified in <u>Schedule 8.1</u> (the "<u>Business Employees</u>"). At the Closing, Buyer shall offer employment to each Business Employee identified by Buyer in writing to Seller on or before the fifth business day following the Closing. To the extent Buyer offers employment to any Business Employee, such offers shall require such individuals to resign their employment with Seller as a condition precedent for employment with the Buyer. All Business Employees who accept offers of employment with the Buyer on or after the Closing shall be referred to herein as "<u>Transferred Employees</u>". The Seller shall assist the Buyer in effecting such Transferred Employees' change of employment in an orderly fashion.

(b) Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, (i) Buyer and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees with respect to their employment by Seller up to the Closing or the last date of employment with Seller, whichever is earlier, and (iii) Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Buyer following the Closing.

(c) Buyer assumes no employee benefit plans of Seller and no obligations of Seller to any Transferred Employee under Seller's employee benefit programs.

## ARTICLE IX

## CLOSING CONDITIONS

9.1 <u>Conditions Precedent to Obligations of Buyer and Seller</u>. The respective obligations of Buyer and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Seller in whole or in part to the extent permitted by applicable Law):

(a) <u>No Injunction</u>. There shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b) <u>Sale Order</u>. The Sale Order shall, among other things, include: (A) a determination that Buyer is a purchaser in good faith within the meaning of section 363(m) of the Bankruptcy Code and entitled to the protections of such section; (B) a waiver of the fourteen (14) day stay set forth in Federal Rule of Bankruptcy Procedure 6004(h);  (C) findings of fact and conclusions of law that the Buyer is not a successor in interest to the Seller or any Affiliate of the Seller; and (D) Encumbrances shall attach to the proceeds which shall be distributed first

11.

to JP Morgan Chase Bank as a secured creditor, then to allowed administrative claims, and the balance held further order of the Bankruptcy Court. At the time of the Closing, the Sale Order shall not have been: (i) stayed or otherwise limited as to its terms or effectiveness; (ii) reversed or stayed; and, (iii) shall not be the subject of an appeal or motion for rehearing or new trial, provided however, that Buyer, in its sole and absolute discretion, may elect to proceed with the Closing even if an appeal from or a motion for rehearing or new trial on the Sale Order is pending.

(c)    <u>All Consents Obtained</u>. All filings, consents and approvals necessary to permit the parties hereto to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

(d)    <u>Substantive Consolidation</u>**.** The Bankruptcy Court's SubCon Order approving the substantive consolidation of PHS and PHP shall have become final and non-appealable and no stay pending appeal is pending.

(e)    <u>Claim Settlement</u>.  The Agreed Order providing for the allowance of TKCA's allowed general unsecured claim and the subordinate portion of its Claim shall have been entered by the Bankruptcy Court

(f)    <u>Designation to Facilitate FAA Certificates Transfer</u>.  Trustee shall facilitate the transfer of the Part 145 certificates of PHP  by designating an Accountable     Manager nominated by TKCA after court approval but prior to closing.

9.2    <u>Conditions to the Obligations of Buyer</u>. The obligations of Buyer to proceed with the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived in whole or in part by Buyer:

(a)    <u>Representations and Warranties</u>. All representations and warranties of Seller contained herein and in all schedules, exhibits and certificates delivered by Seller to Buyer pursuant to this Agreement shall be true and accurate in all material respects on and as of the Closing Date.

(b)    <u>Performance of Covenants</u>. Seller shall have performed and complied in all material respects with each and every covenant, agreement and condition required to be performed or complied with by it hereunder at or prior to the Closing.

(c)    <u>No Encumbrances</u>. All Encumbrances on the Purchased Assets shall have been released or fully discharged pursuant to the Sale Order.

(d)    <u>No Material Adverse Change</u>. There shall have been no Material Adverse Change in the Purchased Assets from the date of this Agreement to the Closing Date.

(e)    <u>Seller's Certificate</u>. Seller shall have delivered to Buyer a certificate signed by a duly authorized signatory of Seller, dated the Closing Date, in form and substance reasonably satisfactory to Buyer and its counsel, certifying as to the satisfaction on the Closing Date of the conditions specified in <u>Sections 9.2(a) through (d)</u> hereof by Seller.

(f)    <u>Deliveries by Seller</u>. Seller shall have delivered, or caused to be delivered, to Buyer, all of the items set forth in <u>Section 3.2</u>, or such items are otherwise satisfied at the Closing.

(g)    <u>Other Documents</u>. At the Closing or as soon as possible thereafter, Seller

shall deliver to Buyer all such other documents and instruments required or relating to the transactions contemplated by this Agreement as Buyer or its attorneys, accountants or advisors may reasonably request.

       9.3    <u>Conditions to the Obligations of Seller</u>. The obligations of Seller to proceed with the Closing are subject to the satisfaction at or prior to the Closing of all of the following conditions, any one or more of which may be waived in whole or in part by Seller:

       (a)    <u>Representations and Warranties True</u>. All representations and warranties of Buyer contained herein and in all schedules, exhibits and certificates delivered by Buyer to Seller pursuant to this Agreement shall be true and accurate in all material respects on and as of the Closing Date.

       (b)    <u>Performance of Covenants</u>. Buyer shall have performed and complied in all material respects with each and every covenant, agreement and condition required to be performed or complied with by it hereunder at or prior to the Closing.

       (c)    <u>Buyer's Certificate</u>. Buyer shall have delivered to Seller a certificate signed by a duly authorized signatory of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Seller and its counsel, certifying as to the satisfaction on the Closing Date of the conditions specified in <u>Sections 9.3(a) and (b)</u> hereof by Buyer.

       (d)    <u>Closing Documents</u>. On or before the Closing Date, Buyer shall have delivered or caused to be delivered, all of the items set forth in <u>Section 3.3</u>.

       (e)    <u>Other Documents</u>. At the Closing or as soon as possible thereafter, Buyer shall deliver to Seller all such other documents and instruments required or relating to the transactions contemplated by this Agreement as Seller or its attorneys, accountants or advisors may reasonably request.

       (f)    Receipt of the Bid Deposit of $250,000 as non-refundable upon execution of this Agreement.

## ARTICLE X

## <u>TERMINATION</u>

       10.1    <u>Termination</u>.   This Agreement may be terminated as follows:

       (a)    At any time by the mutual written agreement of the Seller and the Buyer;

       (b)    Automatically, upon the consummation of any acquisition of the Purchased Assets between Seller and a party other than Buyer;

       (c)    By the Buyer, at its sole election, in the event that the Closing shall not have occurred on or before April 4, 2016 (the "Termination Date"); provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 10.1(d)</u> if the failure of the Closing to occur on or prior to such date results primarily from the Buyer itself materially breaching any representation, warranty or covenant contained in this Agreement;

       (d)    By the Seller, at its sole election, in the event that the Closing shall not have occurred on or before the Termination Date; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this <u>Section 10.1(e)</u> if the failure of the Closing to occur on or prior to such date results primarily from the Seller itself materially breaching any representation, warranty or covenant contained in this Agreement;

13.

(e)     By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Seller or if any representation or warranty of the Seller shall have become untrue in any material respect, either of which would result in a failure of a condition set forth in Section 9.1 or Section 9.2 and in either case such that such breach or untruth cannot be cured or has not been cured by the earlier of (i) five (5) Business Days from receipt of written notice from Buyer of the alleged breach and (ii) the Termination Date;

(f)     By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer or if any representation or warranty of the Buyer shall have become untrue in any material respect, either of which would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and in either case such that such breach or untruth cannot be cured or has not been cured by the earlier of (i) five (5) Business Days from receipt of written notice from Seller of the alleged breach and (ii) the Termination Date;

(g)     By the Buyer, at its sole election, upon the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Case, the filing of any motion by a party in interest in the Case to liquidate the Purchased Assets or any similar commencement of liquidation proceedings relating to Seller, other than as contemplated herein, in each case which are not dismissed within thirty (30) days; or

10.2    Procedure Upon Termination. In the event of termination and abandonment by Buyer or Seller, or both such Parties, pursuant to Section 10.1 hereof, written notice thereof shall forthwith be given to the other Party, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Buyer or Seller. If this Agreement is terminated as provided herein each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same. If this Agreement is terminated for any reason whatsoever, other than pursuant to Section 10.1(f) or upon a sale to another party due to Buyer's failure to perform, the Deposit shall be returned to Buyer forthwith, and the Parties shall have no further obligations to one another except for any obligations that, by their terms, survive the termination of this Agreement. If this Agreement is terminated pursuant to Section 10.1(f) or upon a sale to another party due to Buyer's failure to perform, the Deposit shall be retained by Seller.

10.3    Effect of Termination.  Upon the termination of this Agreement in accordance with Section 10.1, the Parties shall be relieved of any further obligations or liability under this Agreement other than (a) any obligations for material breach of this Agreement occurring prior to such termination, and (b) any obligations contained in Article XI.

## ARTICLE XI

## CHAPTER 11 BANKRUPTCY PROCEEDING

11.1    Defense of Orders. The Seller, at its sole cost and expense, shall diligently defend the Bid Procedures Order and the Sale Order in the event that any motion for reconsideration or appeal of such Orders is filed.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    Amendment and Modification. Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of Seller and Buyer with respect

14.

to any of the terms contained herein.

12.2  <u>Waiver of Compliance</u>. Any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure of the same or any other obligation, covenant, agreement or condition.

12.3  <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

**If to Seller:**

Phoenix Heliparts, Inc. as merged with
   Phoenix Heli Support, L.L.C.
Attention: Mr. Louie Mukai, Trustee
Mukai Greenlee & Company
2600 N. Central Ave.
Ste. 1820
Phoenix, AZ  85004-2600
Fax (602) 279-5191
E-mail: mukail@mukaigreenlee.com

**With a copy to:**
James E. Cross, Esq.
Cross Law Firm, P.L.C.
1850 N. Central Ave., Suite 1150
Phoenix, AZ 85004
Fax: (602) 252-4712
E-mail: jcross@crosslawaz.com

TKC Aerospace, Inc.
Attention: Sam Boyle
224 Seven Farms Drive, Suite 200
Daniel Island, SC  29492
E-mail:  sam.boyle@turneq.com

**With a copy to**:

Engelman Berger, PC
Attn:  Steven N. Berger
3636 N. Central Avenue, Suite 700
Phoenix, Arizona  85012
Fax: (602) 222-4999
E-mail:  snb@eblawyers.com

12.4  <u>Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto without the prior written consent of the other party; provided, however, that Buyer may assign any or all of its rights, interests, and obligations hereunder to one or more of its affiliates, provided, further, however, no such assignment shall relieve Buyer of its obligations hereunder. No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Buyer shall also apply to any such assignee unless the context otherwise requires.

15.

12.5    Governing Law. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE UNITED STATES BANKRUPTCY CODE AND THE LAWS OF THE STATE OF ARIZONA.

12.6    Submission to Jurisdiction. The parties hereto agree that all litigation concerning any dispute between Seller and Buyer arising from or related in any way to this Agreement and the transactions contemplated hereby, those arising out of the sale of the Assets, or any conduct or facts related thereto, shall be heard by the Bankruptcy Court, and if the Bankruptcy Case has been closed, such litigation shall be heard by the United States District Court or the courts of the State of Arizona having subject matter jurisdiction thereof and sitting in Maricopa County, Arizona, and the parties hereby consent to the jurisdiction of such courts for such purpose, and waive any objection they may have thereon based on venue, *forum non conveniens* or similar doctrines.

12.7    Counterparts; Facsimile, Headings. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. This Agreement may be executed and delivered by facsimile transmission or other electronic copy, and a facsimile or electronic copy of this Agreement or of a signature of a party will be effective as an original. The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

12.8    No Third-Party Beneficiaries. This Agreement, the other agreements, and the Schedules and Exhibits hereto and thereto are not intended, and shall not be deemed, to confer upon or give any Person (including, without limitation, any past or current employees of Seller) except the Parties hereto and their respective successors and permitted assigns any remedy, claim, benefit, liability, reimbursement, cause of action or other right under or by reason of this Agreement.

12.9    Incorporation of Schedules. All Schedules and Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

12.10    Entire Agreement. This Agreement, including the documents, exhibits, schedules, certificates and instruments referred to herein, embodies the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions.

12.11    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.12   <u>Time is of the Essence</u>. Time is of the essence in the performance of the terms of this Agreement.

## ARTICLE XIII

## <u>DEFINITIONS</u>

13.1   "<u>Knowledge</u>." Knowledge means with respect to Seller the actual knowledge possessed by Trustee , and with respect to Buyer the actual knowledge possessed by the President of Buyer. For purposes of this definition, "actual knowledge" means what the person knows or should have known with reasonable inquiry and that any fact requiring Knowledge shall mean a material fact.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

**<u>BUYER</u>:**

TKC Aerospace, Inc.

**<u>SELLER</u>:**

Phoenix Heliparts, Inc. & Phoenix Heli Support, LLC

By:_____

By:_____
Louie Mukai, in his capacity as Chapter 11 Trustee

Its_____

_____

17.

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| **EXHIBIT A** | **Bill of Sale** |
| **Schedule 1.1(c)** | **Unfilled Trade Purchase Orders and Open Supply and Sales Contracts** |
| **Schedule 1.1(d)** | **Business Contracts** |
| **Schedule 1.1(e)** | **Customer Lists** |
| **Schedule 1.1(g)** | **Domain Names** |
| **Schedule 1.1(h)** | **Intellectual Property** |
| **Schedule 1.5** | **Unowned Property** |
| **Schedule 2.3** | **Allocation of Purchase Price** |
| **Schedule 4.5** | **Permits** |
| **Schedule 4.9** | **Exceptions to Compliance** |
| **Schedule 4.10** | **Exceptions to Tax Matters** |
| **Schedule 8.1** | **Employees of the Business** |

## EXHIBIT "A"

## BILL OF SALE

Pursuant to the "Asset Purchase Agreement by and Between Phoenix Heliparts, Inc. and Phoenix Heli-Support, L.L.C. as Seller and TKC Aerospace, Inc. or Assignee as Buyer dated as of March __, 2016" ("Purchase Agreement"), this Bill of Sale is given by Chapter 11 Trustee Louie Mukai on behalf of Seller ("Transferor"), to TKCA Aerospace, Inc. or assignee if stated below ("Transferee") for the sale and purchase of the assets identified in the Asset Purchase Agreement, subject to the terms and conditions of that certain ***Order Granting Trustee's Motion to Sell Assets Free and Clear and for Related Relief*** ("Order") entered on _____, by the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") in the now pending Chapter 11 bankruptcy case, No. 2:15-bk-12003-DPC.

In consideration of the Order and for other good and valuable consideration provided in the Purchase Agreement, the receipt and adequacy of which are hereby acknowledged, Transferor does hereby sell, transfer, assign, and convey to the Transferee, all right, title, and interest in and to the Property as identified as the "Purchased Assets" as set forth in the Purchase Agreement, relevant sections of which are attached hereto as <u>Exhibit A, in accordance with all terms thereof, including the provisions indicating the Purchase is "as-is, where-is"</u>.

EXECUTED AND DELIVERED as of _____, 2016

**TRANSFEROR:**

**Phoenix Heliparts, Inc., Chapter 11 Debtor (including**
**By prior consolidation Phoenix Heli-Support, L.L.C.,**
**by Chapter 11 Trustee Louie Mukai**

_____

**SCHEDULE 1.1(c)**

<u>Unfilled Trade Purchase Orders and Open Supply and Sales Contracts</u>

Contracts designated for <u>assumption</u> and <u>assignment</u> (to date):

1.  Airbus Service Center Agreement – Airbus wants to work with TCKA

2.  Latium Management – UK Customer

3.  Heli-skills Limited – Australian Representative

4.  Philcox – Philippine Partners

**SCHEDULE 1.1(d)**

<u>Business Contracts</u>


Contracts designated for <u>assumption</u> and <u>assignment</u> (to date):

1.  Current Mesa Facility Lease

2.  All rights under Debtor's telephone hardware and service contract with AT&T, including all the PHP cell numbers issued thereunder, and all existing hardware being used thereunder.

**SCHEDULE 1.1(e)**

<u>Customer Lists</u>

All customer lists maintained by the Seller, whether in written form or stored in computer data,

including, but not limited to, all Accounts Receivable aging reports, but this does not modify the provisions of this Agreement regarding which  Accounts Receivable are being sold.

**SCHEDULE 1.1(g)**

<u>Domain Names</u>

1. www.phoenixheliparts.com

2. www.phoenixheli-support.com

**SCHEDULE 1.1(h)**

<u>Intellectual Property</u>

No specific items to add to description of assets in 1.1(h).

**SCHEDULE 1.5**

<u>Unowned Property</u>

No inventory taken at this time.

**SCHEDULE 2.3**

Allocation of Purchase Price

To be provided at close

**SCHEDULE 4.5**

<u>Permits</u>

Any rights in or ability to transfer the FAA Part 145 Certificates of  PHP are excepted from representation.

**SCHEDULE 4.9**

<u>Exceptions to Compliance</u>

No exceptions

**SCHEDULE 4.10**

<u>Exceptions to Tax Matters</u>

No exceptions

**SCHEDULE 8.1**

Employees of the Business (as of March 30, 2016)

1. Alejandro Diaz Gomez

2. Andrew Gutierrez-Patrick*

3. Brandon Clausen*

4. Chad Carter

5. David Boring

6. Heather Lawson

7. Jason Pascual

8. Justin DeStories

9. Michael Marlar

10. Russell Ary

11. Ryan Howe*

12. Selena Sanborn

    * - Have provided notice of resignation